REICH, ADELL & CVITAN
A PROFESSIONAL LAW CORPORATION

3550 WILSHIRE BOULEVARD, SUITE 2000
LOS ANGELES, CALIFORNIA 90010
TEL: (213) 386-3860 • FAX: (213) 386-5583
www.rac-law.com

HIRSCH ADELL
ALEXANDER B. CVITAN
MARIANNE REINHOLD
LAURENCE S. ZAKSON
CARLOS R. PEREZ
NEELAM CHANDNA
WILLIAM Y. SHEH
J. DAVID SACKMAN
MARSHA M. HAMASAKI
PETER A. HUTCHINSON
NATALIA BAUTISTA
AARON G. LAWRENCE
ANGELA SERRANZANA
ADAM J. THOMAS
CHUONG NGUYEN
JAVIER J. CASTRO

OF COUNSEL
SHIRLEY A. LEE
JULIUS MEL REICH
(1933-2000)

June 10, 2016

Karen Virginia Price
Morrow-Meadows Corporation
231 Benton Court
City of Industry, CA 91789

Re: Construction Laborers Trust Funds for Southern California Admin. Co. v. Morrow-Meadows Corp. Audit #104344 (our # LTADC.1369A)

Dear Ms. Price:

This office represents the Construction Laborers Trust Funds for Southern California Administrative Company (Trust Funds). The Trust Funds attempted to audit your records, pursuant to your collective bargaining agreement with the Southern California District Council of Laborers and its Affiliated Locals (Union). However, you did not allow a full audit. Only a partial audit was completed, which is attached. At this time, you need to:

1) Arrange for payment of the partial audit; and

2) Arrange for completion of the full audit.

If this is not done promptly, we must file suit to compel a full audit, and to collect any delinquencies found. Please contact the auditor, below, to arrange for the audit, and contact me to arrange payment, or if you have any questions. The best way to reach me is by email at: jds@rac-law.com.

Sincerely,

J. David Sackman
REICH, ADELL & CVITAN

JDS:caw
Encl: Partial Audit 9/2013-1/2016
Cc: Marisela Andrade, CLTF (via email: mtrujillo@cltf.com)
George Figueroa, CLTF (via email: gfigueroa@cltf.com)
303688v1

CLTF

Construction Laborers Trust Funds
for Southern California Administrative Company, LLC.

COLLECTION OFFICE

May 19, 2016

**Morrow-Meadows Corporation**
231 Benton Court
City of Industry, CA 91789

Re: Audit Billing Acct. # 104344
**PARTIAL** - Audit Period: September 1, 2013 - January 31, 2016

Gentlemen:

Pursuant to our audit of your records, based on the materials and information you furnished, attached is a Schedule of Outstanding Delinquencies.

| Account # | Fringe Benefits | Liquidated Damages | Interest | Audit Fees | Total |
|---|---|---|---|---|---|
| 104344 (MLA12) | $53,291.79 | $13,774.78 | $6,215.09 | $1,760.00 | $75,041.66 |
| **Grand Total** | $53,291.79 | $13,774.78 | $6,215.09 | $1,760.00 | $75,041.66 |

Your remittance in the amount of $75,041.66 is now due and payable to the Southern California Laborers' Trusts.

Should we not hear from you within twenty (20) days from the date of this notice to resolve the billing notice, your account(s) will be published on the **DELINQUENT ROSTER** with the Southern California Laborers Trust Funds Administrative Company, LLC. This list is distributed to all local unions and contractors throughout Southern California and being placed in the Delinquency Roster may affect your company's ability to obtain future contracts for work.

This is a Partial Audit Billing. Per the terms of the Master Labor Agreement, we ae still seeking review the balance of payroll not yet reviewed from September 1, 2013-Present.

If you have any questions regarding the audit, please contact the undersigned, at **(626) 258-9044, Ext. 130.** In the event you do not require any additional information, we trust that payment will be forthcoming.

Sincerely,
CONSTRUCTION LABORERS TRUST FUNDS FOR SOUTHERN CALIFORNIA ADMINISTRATIVE COMPANY, LLC

George Figueroa
Account Representative
gfigueroa@cltf.com

Cc: Richard Quevedo, Executive Director
George Moss, Audit Manager
Marisela Andrade, Field Auditor
Marcy Uribe Sanchez, PSWA

Account #: 104344

**CONSTRUCTION LABORERS TRUST FUND AUDIT**
**PARTIAL - SCHEDULE OF OUTSTANDING DELINQUENCIES**
**MORROW-MEADOWS CORPORATION**
231 BENTON COURT
CITY OF INDUSTRY, CA 91789

**Audit Billing for the Period: September 1, 2013 - January 31, 2016**

**Agreement / Rate Variation - Sig Type: Laborers / Standard - MLA-12**

**Audit Under Reported Employees**

| Work Period | Job Class | Composite Rate | Hours | Contributions | Liquidated Damages | Interest | Interest Period | Total |
|---|---|---|---|---|---|---|---|---|
| 01/01/2014 | J | $18.19 | 44.00 | $800.36 | $159.76 | $103.27 | 05/16/16 | $1,063.39 |
| 04/01/2014 | J | $18.19 | 40.00 | $727.60 | $145.24 | $84.00 | 05/16/16 | $956.84 |
| 04/01/2015 | J | $18.79 | 120.00 | $2,254.80 | $450.12 | $130.11 | 05/16/16 | $2,835.03 |
| Audit Under Reported | | Totals: | 204.00 | $3,782.76 | $755.12 | $317.38 | | $4,855.26 |

**Subcontractor Violations**

| Work Period | Job Class | Composite Rate | Hours | Contributions | Liquidated Damages | Interest | Interest Period | Total |
|---|---|---|---|---|---|---|---|---|
| 01/10-8/13 | AUDIT | | | $0.00 | $2,902.70 | $1,407.52 | 02/06/14 | $4,310.22 |
| 09/01/2013 | | | | $21,700.67 | $4,340.13 | $3,224.55 | 05/16/16 | $29,265.35 |
| 11/01/2013 | | | | $1,418.82 | $283.76 | $197.02 | 05/16/16 | $1,899.60 |
| 03/01/2014 | | | | $1,400.63 | $280.13 | $167.97 | 05/16/16 | $1,848.73 |
| 05/01/2014 | | | | $181.90 | $36.38 | $20.01 | 05/16/16 | $238.29 |
| 06/01/2014 | | | | $1,255.11 | $251.02 | $132.52 | 05/16/16 | $1,638.65 |
| 10/01/2014 | | | | $977.08 | $195.42 | $83.93 | 05/16/16 | $1,256.43 |
| 11/01/2014 | | | | $1,334.09 | $266.82 | $108.49 | 05/16/16 | $1,709.40 |
| 01/01/2015 | | | | $977.08 | $195.41 | $69.90 | 05/16/16 | $1,242.39 |
| 03/01/2015 | | | | $169.11 | $33.82 | $10.56 | 05/16/16 | $213.49 |
| 05/01/2015 | | | | $1,033.45 | $206.69 | $54.56 | 05/16/16 | $1,294.70 |
| 06/01/2015 | | | | $1,728.68 | $345.74 | $83.12 | 05/16/16 | $2,157.54 |
| 07/01/2015 | | | | $1,277.72 | $255.54 | $54.82 | 05/16/16 | $1,588.08 |
| 08/01/2015 | | | | $1,469.93 | $293.99 | $56.33 | 05/16/16 | $1,820.25 |
| 10/01/2015 | | | | $1,393.57 | $278.71 | $39.79 | 05/16/16 | $1,712.07 |
| 01/01/2016 | | | | $13,191.19 | $2,633.40 | $186.62 | 05/16/16 | $16,011.21 |
| Subcontractor | | Totals: | 0.00 | $49,509.03 | $12,799.66 | $5,897.71 | | $68,206.40 |

**Past Delinquencies**

| Work Period | Job Class | Composite Rate | Hours | Contributions | Liquidated Damages | Interest | Interest Period | Total |
|---|---|---|---|---|---|---|---|---|
| 07/01/2014 | | | | $0.00 | $220.00 | $0.00 | | $220.00 |
| Past Delinquencies | | Totals: | | $0.00 | $220.00 | $0.00 | | $220.00 |
| Agreement / Rate Variation Totals: | | | 204.00 | $53,291.79 | $13,774.78 | $6,215.09 | | $73,281.66 |

**Other Fees and Costs:**

| Type | Date | Description | Balance |
|---|---|---|---|
| AUDIT | 10/09/2013 | Audit Fees: Audit 20130324 | $480.00 |
| AUDIT | 10/11/2013 | Audit Fees: Audit 20130324 | $480.00 |
| AUDIT | 05/12/2016 | Audit Fees: Audit 20140420 | $800.00 |
| | | Total Fees: | $1,760.00 |

| | Hours | Contributions | Liquidated Damages | Interest | Total |
|---|---|---|---|---|---|
| Grand Totals: | 204.00 | $53,291.79 | $13,774.78 | $6,215.09 | $75,041.66 |

#20140420

## MORROW-MEADOWS CORPORATION # 104344

## SCHEDULE OF HOURS UNDER REPORTED

**Audit Period: 09/01/2013 - 01/31/2016**

| Name | SSN | Work Period | Job Class | Hours Worked | Hours Reported | Hours Due | Hourly Fringe Rate | Flat Fringe Rate | * Amount Due |
|---|---|---|---|---|---|---|---|---|---|
| **Under Reported Employees** | | | | | | | | | |
| **Agreement:** Laborers (Standard - MLA-12) | | | | | | | | | |
| CHEW, ERIC | xxx-xx-4862 | 01/14 | J | 127.00 | 83.00 | 44.00 | 18.19 | | 800.36 |
| | | | **Job Class 'J' Total:** | | | 44.00 | | | 800.36 |
| | | | **Jan-14 Total:** | | | 44.00 | | | 800.36 |
| CHEW, ERIC | xxx-xx-4862 | 04/14 | J | 48.00 | 8.00 | 40.00 | 18.19 | | 727.60 |
| | | | **Job Class 'J' Total:** | | | 40.00 | | | 727.60 |
| | | | **Apr-14 Total:** | | | 40.00 | | | 727.60 |
| CHEW, ERIC | xxx-xx-4862 | 04/15 | J | 120.00 | 0.00 | 120.00 | 18.79 | | 2,254.80 |
| | | | **Job Class 'J' Total:** | | | 120.00 | | | 2,254.80 |
| | | | **Apr-15 Total:** | | | 120.00 | | | 2,254.80 |
| | | | **Under Reported Employees Total:** | | | 204.00 | | | 3,782.76 |
| | | | **Grand Total:** | | | 204.00 | | | 3,782.76 |

* Note: The amounts due calculated per employee may have small rounding differencies. Consequently, the total due per the Schedule of Hours Under Reported may vary from the total that appears on the Schedule of Outstanding Delinquencies. The amount payable is the amount that appears on the Schedule of Outstanding Delinquencies and is calculated by taking the total hours due for the work period multiplied by the fringe benefit rate.

*Page 1 of 1*

*SCHEDULE A*

## SCHEDULE OF SUBCONTRACT LABOR

**CONTRACTOR: Morrow-Meadows Corporation**
**ACCOUNT #: 104344**

| SUBCONTRACTOR | DATE PAID | AMOUNT PAID | % OF LABOR COST | ESTIMATED LABOR COST | WAGE RATE | TOTAL HOURS | FRINGE BENEFIT RATE | FRINGE BENEFIT AMOUNT |
|---|---|---|---|---|---|---|---|---|
| Corrpro Companies, Inc. | 9/13/2013 | $2,025.00 | 50% | $1,012.50 | $33.24 | 31.00 | $18.19 | $563.89 |
| Corrpro Companies, Inc. | 9/20/2013 | $5,400.00 | 50% | $2,700.00 | $33.24 | 82.00 | $18.19 | $1,491.58 |
| Corrpro Companies, Inc. | 9/27/2013 | $5,730.97 | 50% | $2,865.49 | $33.24 | 87.00 | $18.19 | $1,582.53 |
| Corrpro Companies, Inc. | 7/14/2015 | $2,326.70 | 50% | $1,163.35 | $34.66 | 34.00 | $18.79 | $638.86 |
| Diamon D's Concrete Cutting | 1/15/2015 | $500.00 | 50% | $250.00 | $34.66 | 8.00 | $18.79 | $150.32 |
| Diamon D's Concrete Cutting | 10/8/2015 | $5,000.00 | 50% | $2,500.00 | $34.66 | 73.00 | $19.09 | $1,393.57 |
| Nowlin Fence, Inc. | 11/7/2013 | $150.00 | 50% | $75.00 | $33.24 | 3.00 | $18.19 | $54.57 |
| Nowlin Fence, Inc. | 5/15/2014 | $625.00 | 50% | $312.50 | $33.24 | 10.00 | $18.19 | $181.90 |
| Nowlin Fence, Inc. | 7/23/2015 | $2,298.00 | 50% | $1,149.00 | $34.66 | 34.00 | $18.79 | $638.86 |
| RCB Construction, Inc. | 9/26/2013 | $65,958.00 | 50% | $32,979.00 | $33.24 | 993.00 | $18.19 | $18,062.67 |
| RCB Construction, Inc. | 11/14/2013 | $4,940.00 | 50% | $2,470.00 | $33.24 | 75.00 | $18.19 | $1,364.25 |
| RCB Construction, Inc. | 1/7/2016 | $47,849.00 | 50% | $23,924.50 | $34.66 | 691.00 | $19.09 | $13,191.19 |
| RS Construct, Inc. | 10/16/2014 | $3,291.00 | 50% | $1,645.50 | $34.66 | 48.00 | $18.79 | $901.92 |
| Team C Construction | 3/27/2014 | $5,100.00 | 50% | $2,550.00 | $33.24 | 77.00 | $18.19 | $1,400.63 |
| Team C Construction | 6/12/2014 | $4,560.00 | 50% | $2,280.00 | $33.24 | 69.00 | $18.19 | $1,255.11 |
| Team C Construction | 10/9/2014 | $240.00 | 50% | $120.00 | $34.66 | 4.00 | $18.79 | $75.16 |
| Team C Construction | 11/20/2014 | $4,900.00 | 50% | $2,450.00 | $34.66 | 71.00 | $18.79 | $1,334.09 |
| Team C Construction | 1/29/2015 | $3,000.00 | 50% | $1,500.00 | $34.66 | 44.00 | $18.79 | $826.76 |
| Team C Construction | 3/12/2015 | $600.00 | 50% | $300.00 | $34.66 | 9.00 | $18.79 | $169.11 |
| Team C Construction | 5/14/2015 | $3,800.00 | 50% | $1,900.00 | $34.66 | 55.00 | $18.79 | $1,033.45 |
| Team C Construction | 6/18/2015 | $6,320.00 | 50% | $3,160.00 | $34.66 | 92.00 | $18.79 | $1,728.68 |
| Team C Construction | 8/6/2015 | $5,300.00 | 50% | $2,650.00 | $34.66 | 77.00 | $19.09 | $1,469.93 |
| | | | | | | | | |
| **Total Forward** | | **$179,913.67** | | **$89,956.84** | | **2667.00** | | **$49,509.03** |

*Hours Due=Estimated Labor Cost Divided by Wage Rate

# McLEOD & WITHAM LLP

300 SOUTH GRAND AVENUE
SUITE 2525
LOS ANGELES, CALIFORNIA 90071
TEL 213-627-3600 FAX 213-627-6290
www.mmwf.com

Author Phone: (213) 627-6286
dmcleod@mmwf.com

June 23, 2016

**BY EMAIL**

J. David Sackman
REICH, ADELL &CVITAN
3550 Wilshire Boulevard, Suite 2000
Los Angeles, California 90010

Re: Morrow-Meadows Corporation;
Audit Billing Account #104344

Dear Mr. Sackman:

I write to update you on the timing of the response of Morrow-Meadows. Regarding what you refer to as the "partial audit", Morrow-Meadows is working with subcontractors to obtain the information which will enable it to perform the appropriate calculation. I shall have a response to you by the end of the month as to all the issues raised by Laborers Trust Funds.

Very truly yours,

David S. McLeod

REICH, ADELL & CVITAN
A PROFESSIONAL LAW CORPORATION

3550 WILSHIRE BOULEVARD, SUITE 2000
LOS ANGELES, CALIFORNIA 90010
TEL: (213) 386-3860 • FAX: (213) 386-5583
www.rac-law.com

HIRSCH ADELL
ALEXANDER B. CVITAN
MARIANNE REINHOLD
LAURENCE S. ZAKSON
CARLOS R. PEREZ
NEELAM CHANDNA
WILLIAM Y. SHEH
J. DAVID SACKMAN
MARSHA M. HAMASAKI
PETER A. HUTCHINSON
NATALIA BAUTISTA
AARON G. LAWRENCE
ANGELA SERRANZANA
ADAM J. THOMAS
CHUONG NGUYEN
JAVIER J. CASTRO

OF COUNSEL
SHIRLEY A. LEE

JULIUS MEL REICH
(1933-2000)

June 27, 2016

**Via Facsimile and Email**
Fax No. 213-627-6290
Email: dmcleod@mmwf.com, lperez@mmwf.com

David S. McLeod
MCLEOD & WITHAM LLP
300 South Grand Ave. Suite 2525
Los Angeles, CA 90071

Re: Construction Laborers Trust Funds for Southern California Admin. Co v. Morrow-Meadows Corp. Audit #104344 (our # LTADC.1369A)

Dear Mr. McLeod:

In response to the partial audit of your client, Morrow-Meadows Corp. (Employer) by our client, the Construction Laborers Trust Funds for Southern California Administrative Company (Trust Funds), you contend that, other than one employee, "All other relevant work was performed by IBEW electricians and was reported to the IBEW Trust Funds." Your letter to my client states that "We will allow you to review documents at Morrow-Meadows that prove the work was reported to the IBEW Trust Funds."

In order to do what you suggest, we will need to review the *full* payroll of the Employer, and compare it to the contribution reports to the IBEW Trust Funds, for the audit period of September 2013 through January 2016. This is what I meant by "completion of the full audit" in my June 10 letter to your client. Completing this audit would be without prejudice to the positions of the parties as to whether or not such work was covered by the Laborers agreements, and whether or not payment to the IBEW Trust Funds would be recognized as a defense. Before we can even address those issues, we need to know whether the issues even arise at all. As noted by the Supreme Court the ability of trust funds to audit a sample larger than what the employer admitted was covered is supported:

> "by the accounting profession's generally accepted auditing standards, which articulate the elementary principle that for an auditor to verify a certain selection decision, he must refer to a universe broader than the selection itself." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 567, 105 S. Ct. 2833, 86 L. Ed. 2d 447 (1985).

Please let me know whether your client will provide the records requested. The best way to reach me is by email at:
jds@rac-law.com.

Sincerely,

J. David Sackman
REICH, ADELL & CVITAN

JDS/va
cc: Marisela Andrade, CLTF (via email: mtrujillo@cltf.com)
George Figueroa, CLTF (via email: gfigueroa@cltf.com)
304387v1

McLEOD & WITHAM LLP

300 SOUTH GRAND AVENUE
SUITE 2525
LOS ANGELES, CALIFORNIA 90071
TEL 213-627-3600 FAX 213-627-6290
www.mmwf.com

Author Phone: (213) 627-6286
dmcleod@mmwf.com

July 8, 2016

**BY EMAIL**

J. David Sackman
REICH, ADELL &CVITAN
3550 Wilshire Boulevard, Suite 2000
Los Angeles, California 90010

Re: Morrow-Meadows Corporation;
Audit Billing Account #104344

Dear Mr. Sackman:

Morrow-Meadows Corporation (Company) responds to the audit requests as follows.

The Company disputes the "partial audit" calculations set forth in the May 19 letter of George Figueroa. The Company will contact the staff at Laborers Trust Funds and attempt to reach a resolution on the "partial audit."

The Company objects to the scope of the full audit request. Except for Eric Chew all other relevant work was performed by IBEW electricians and was reported to the IBEW Trust Funds. Company will allow Laborers Trust Funds to review documents at Company that prove the work was reported to the IBEW Trust Funds. Please call me to arrange a mutually convenient time for the review.

Very truly yours,

D.S. McL

David S. McLeod

## J. David Sackman

| | |
|---|---|
| **From:** | J. David Sackman |
| **Sent:** | Friday, July 08, 2016 2:26 PM |
| **To:** | 'dmcleod@mmwf.com'; 'lperez@mmwf.com' |
| **Cc:** | George Figueroa (gfigueroa@cltf.com); Marisela Andrade (mtrujillo@cltf.com); Virginia Alvarez |
| **Subject:** | Const. Laborers Trust Funcs v. Morrow-Meadows Corp. Audit #104344 (our # LTADC.1369A) |

Dear Mr. McLeod:

I have the sinking feeling that we are going in circles in this matter. Your letter of today to me seems almost identical to your letter of June 6, 2016. I hope we can move forward instead.

As to the partial audit, your client sent the Trust Funds material regarding those audit findings, which have been forwarded to me. The Trust office is reviewing this material, but any resolution must be made between counsel. On our side, we cannot "close" the matter or release anything, until the entire audit is resolved.

As to the remaining audit, my letter of June 10, 2016 set out exactly what we still need: to review the full payroll of the Employer, and compare it to the contribution reports to the IBEW Trust Funds, for the audit period of September 2013 through January 2016. Your letter of today again offers to allow us "to review documents at Company that prove the work was reported to the IBEW Trust Funds" without responding to my specific request.

Please confirm 1) what records will be shown to the auditor; and 2) where those records will be produced. The auditor can contact the company directly to set up the time and details. If you prefer, you can just send a copy of the records in question for our review.

Sincerely,

J. David Sackman

**McLEOD & WITHAM LLP**

300 SOUTH GRAND AVENUE
SUITE 2525
LOS ANGELES, CALIFORNIA 90071
TEL 213-627-3600 FAX 213-627-6290
www.mmwf.com

Author Phone: (213) 627-6286
dmcleod@mmwf.com

July 11, 2016

**BY EMAIL**

J. David Sackman
REICH, ADELL &CVITAN
3550 Wilshire Boulevard, Suite 2000
Los Angeles, California 90010

Re: Morrow-Meadows Corporation;
Audit Billing Account #104344

Dear Mr. Sackman:

I write in reply to your voicemail of last Friday, July 8, which was in response to my letter to you regarding the full audit demand and my clients letter to Laborers Trust Funds staff trying to resolve the partial audit.

As I understood your voicemail it is the position of Laborers Trust Funds that it refuses to resolve the partial audit until the full audit is also resolved. If that is not accurate please advise. Assuming it is accurate please explain why the partial audit cannot be resolved independent of the demanded full audit. My client sent your client a good faith analysis and dollar offer on the partial audit.

Regarding the full audit you demand, my client has consistently stated it would allow Laborers Trust Funds to review the documents that prove the work was reported to the IBEW Trust Funds. Specifically, it will allow your client to review a summary of labor hours worked from its accounting system (without employee information), Union Reports and check copies for what was reported and paid to the Union(s). It will not provide payroll records for employees that are not laborers and who were working under the IBEW Agreement. Such a demand is overbroad, unduly burdensome, and raises substantial privacy issues regarding personal identification information.

I look forward to receiving your response.

Very truly yours,

David S. McLeod

**J. David Sackman**

| | |
|---|---|
| **From:** | J. David Sackman |
| **Sent:** | Thursday, August 04, 2016 12:14 PM |
| **To:** | 'David McLeod' |
| **Cc:** | Virginia Alvarez; Lety Perez (lperez@mmwf.com); gmoss@cltf.com |
| **Subject:** | RE: Morrow Meadows Corporation - Construction Laborers Trust Funds for Southern California; (our # LTADC.1369A) |
| **Attachments:** | LtrMcLeod2016-06-27.pdf; 2015MLAArtXXV.pdf; 13-00414AuditOrder113.pdf |

Mr. McLeod:

Your letter of July 11, 2016 is the same as your letter to me of July 8 and your letter to my client on June 6. In each, you assert that your client will only produce payroll records for those it considers "laborers," without the employee information the Trust Funds require, and will NOT provide records for employees that it does not consider "laborers." As I already explained in my letter of June 27 (attached), we require all payroll records for all employees for the audit period, and your other objections are without merit. Attached also is Article XXV from the Master Labor Agreement, which requires a full audit (see subsection J).

If your client is willing to provide this full audit, our auditor George Moss (copied here) will contact your client (or you first, if you wish) to arrange for the audit on one of the dates you suggest (8/23, 9/6 or 10/4).

However, if you will not agree to allow the *full* audit, we will have no choice but to file suit to compel an audit. Attached is a recent decision from the district court, in which we successfully obtained an order for a full audit. I urge you to convince your client to allow the full audit, as required by both its contract and obligations under ERISA, and save the considerable expense of litigation. If necessary, we can argue about the results of the audit once it is completed.

Sincerely,

J. David Sackman

---

**From:** David McLeod [mailto:dmcleod@mmwf.com]
**Sent:** Thursday, August 04, 2016 11:55 AM
**To:** J. David Sackman; Alfaro, Andrea
**Cc:** Virginia Alvarez; Lety Perez (lperez@mmwf.com)
**Subject:** Re: Morrow Meadows Corporation - Construction Laborers Trust Funds for Southern California; (our # LTADC.1369A)

Mr. Sackman, you have not responded to my July 11 letter. Please do so in due course. Morrow-Meadows again confirms that it wants to resolve this matter. I urge your client to visit the Morrow-Meadows office and review the offered documents. Morrow-Meadows proposes the following dates: August 23, September 6 or October 4. David McLeod.

On 8/2/2016 2:45 PM, J. David Sackman wrote:

Ms. Alfaro:

We have reviewed the correspondence you forwarded from Morrow Meadows Corporation, challenging this bond claim. However, we have been unable to verify the contentions.

We have been seeking to complete an audit of this employer. Until we can complete the audit, we can neither verify these contentions, nor release any claim, since there may be more contributions due which we are not aware of without the audit. However, Morrow Meadows has not agreed to allow the full scope of audit we need, as required by its collective bargaining agreements and incorporated trust agreements.

If we are unable to obtain the audit we need shortly, we will have to file suit to compel the audit. In that event, we may add this bond claim to the lawsuit. I am copying the attorney for Morrow Meadows, David S. McLeod, in the hope we can resolve this shortly. In the meantime, if you have any questions, the best way to reach me is through this email.

Sincerely,
J. David Sackman

---

**From:** Alfaro, Andrea [mailto:AHobson@tmhcc.com]
**Sent:** Friday, July 08, 2016 4:05 PM
**To:** J. David Sackman
**Subject:** FW: Morrow Meadows Corporation - Construction Laborers Trust Funds for Southern California;

Mr. Sackman:

This is in regard to the claim Construction Laborers Trust Funds made against the contractor's license bond that we issued to Morrow Meadows Corporation. As indicated in our June 14, 2016 email to George Figueroa, we can only consider $2,254.80 of the claim for the April 2015 contributions. The bond principal provided us with the attached letter and spreadsheet in which they dispute owing the $2,254.80 on the basis that those hours were for vacation time that they paid to their employee. Please provide us with a response to the dispute. In the interim, we are extending the claim by up to an additional thirty (30) days.

We continue to reserve all of our rights and defenses under the bond, the law or otherwise.

**Andrea Alfaro**
Bond Claims Supervisor
Tokio Marine HCC – Surety Group
AHobson@tmhcc.com
Tel: 310-957-3044
tmhcc.com

**HCC is now Tokio Marine HCC. Please note the change in my email address.**

J. David Sackman, Esq.
Reich, Adell & Cvitan
A Professional Law Corporation
3550 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90010
(213) 386-3860 (voice)
(213) 386-5583 (facsimile)

This e-mail and any files transmitted with it are confidential and we intend them solely for the use of the individual or entity to whom we have addressed them. This may contain material protected by the attorney-client privilege, and if it is not addressed to, or if you are not the person responsible for delivering the e-mail to the intended recipient, you have received this e-mail in error and you may not use, disseminate, forward, print, or copy it. If you received this e-mail in error, please immediately reply to the sender or notify us at Reich, Adell & Cvitan by telephone at (213) 386-3860.

--

David S. McLeod
McLeod & Witham LLP
300 South Grand Avenue, Suite 2525
Los Angeles, California 90071
Direct: (213) 627-6286
Main: (213) 627-3600
Fax: (213) 627-6290
dmcleod@mmwf.com
www.mmwf.com

This e-mail (including any attachments) may contain confidential information that is private, proprietary or protected by the attorney-client privilege, work product doctrine or other privileges. If you received this e-mail in error, please delete it from your system without downloading, copying or saving it and notify the sender by reply e-mail to allow us to correct our records. Unauthorized use, copying, disclosure or dissemination of the information in this e-mail is prohibited and may be subject to legal restriction or sanction. Thank you.

REICH, ADELL & CVITAN
A PROFESSIONAL LAW CORPORATION

3550 WILSHIRE BOULEVARD, SUITE 2000
LOS ANGELES, CALIFORNIA 90010
TEL: (213) 386-3860 • FAX: (213) 386-5583
www.rac-law.com

HIRSCH ADELL
ALEXANDER B. CVITAN
MARIANNE REINHOLD
LAURENCE S. ZAKSON
CARLOS R. PEREZ
NEELAM CHANDNA
WILLIAM Y. SHEH

J. DAVID SACKMAN
MARSHA M. HAMASAKI
PETER A. HUTCHINSON
NATALIA BAUTISTA
AARON G. LAWRENCE
ANGELA SERRANZANA
ADAM J. THOMAS
CHUONG NGUYEN
JAVIER J. CASTRO

OF COUNSEL
SHIRLEY A. LEE

JULIUS MEL REICH
(1933-2000)

June 27, 2016

**Via Facsimile and Email**
Fax No. 213-627-6290
Email: dmcleod@mmwf.com, lperez@mmwf.com

David S. McLeod
MCLEOD & WITHAM LLP
300 South Grand Ave. Suite 2525
Los Angeles, CA 90071

Re: Construction Laborers Trust Funds for Southern California Admin. Co v. Morrow-Meadows Corp. Audit #104344 (our # LTADC.1369A)

Dear Mr. McLeod:

In response to the partial audit of your client, Morrow-Meadows Corp. (Employer) by our client, the Construction Laborers Trust Funds for Southern California Administrative Company (Trust Funds), you contend that, other than one employee, "All other relevant work was performed by IBEW electricians and was reported to the IBEW Trust Funds." Your letter to my client states that "We will allow you to review documents at Morrow-Meadows that prove the work was reported to the IBEW Trust Funds."

In order to do what you suggest, we will need to review the *full* payroll of the Employer, and compare it to the contribution reports to the IBEW Trust Funds, for the audit period of September 2013 through January 2016. This is what I meant by "completion of the full audit" in my June 10 letter to your client. Completing this audit would be without prejudice to the positions of the parties as to whether or not such work was covered by the Laborers agreements, and whether or not payment to the IBEW Trust Funds would be recognized as a defense. Before we can even address those issues, we need to know whether the issues even arise at all. As noted by the Supreme Court the ability of trust funds to audit a sample larger than what the employer admitted was covered is supported:

> "by the accounting profession's generally accepted auditing standards, which articulate the elementary principle that for an auditor to verify a certain selection decision, he must refer to a universe broader than the selection itself." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 567, 105 S. Ct. 2833, 86 L. Ed. 2d 447 (1985).

Please let me know whether your client will provide the records requested. The best way to reach me is by email at:
jds@rac-law.com.

Sincerely,

J. David Sackman
REICH, ADELL & CVITAN

JDS/va
cc: Marisela Andrade, CLTF (via email: mtrujillo@cltf.com)
George Figueroa, CLTF (via email: gfigueroa@cltf.com)

304387v1

**A.** The Contractor shall pay its monthly contributions to the Trust Funds accompanied by a fully completed and executed report form furnished by the Trust Funds. The Contractor shall include with the monthly report form in a format acceptable to the Trust Funds:

(a) The identification of each job worked on by the Contractor during the month, including the job location, the owner of the job location property, and the name and address of the entity for whom the Contractor is working.

(b) The name and social security number of each employee who performed covered work, indicating the number of hours each employee worked on each jobsite.

The provisions of subsections a. and b. above shall be implemented by the Trust Fund Administrator, in consultation with the Associations and Union, in a way that minimizes any inconvenience to the Contractor. The information provided by the reports required by subsections a. and b. shall be maintained in a confidential, restricted access manner by the Trust Funds for collection and fringe benefit eligibility purposes.

**B.** The Trustees of the Trust Fund shall furnish the Contractor Associations and the Union with a list of delinquent Contractors each month. Such list will also be available to all signatory Contractors on request, subject to such reasonable cost as may be determined by the administrative office of the Trust Funds as representing the cost of duplication and transmission of such lists, payment for which to be made in advance. The Contractor agrees he will not subcontract any portion of his job to any subcontractor whose name appears on the delinquent list until such subcontractor has paid all delinquent monies to the various Trust Funds. In the event the Contractor subcontracts to any such delinquent subcontractor in violation of the foregoing, the Contractor shall remove such subcontractor from the job immediately, unless such delinquent subcontractor immediately makes full payment for all delinquencies to the Trusts.

**C.** If the Contractor fails to remove the delinquent subcontractor, the Contractor shall become financially responsible for all fringe benefits owed to any funds established by this Agreement by the Contractor or by his subcontractor or the subcontractor of his subcontractor for work performed on the Contractor's job or project in accordance with the requirements set forth below.

**D.** The term "Contractor" for delinquency purposes only, shall include all entities of the delinquent Contractor, change of name, or change of entity, provided that the delinquent contractor holds at least ten (10%) percent ownership in the new entity.

**E.** In the event the Contractor subcontracts to a subcontractor that is not on the delinquency list at the time the subcontract is entered into, the Trust Office shall notify the Contractor of any delinquency of the subcontractor within ninety (90) days of the date the delinquency first occurred and in no case shall the Contractor be liable for fringe benefit contributions of a subcontractor for more than ninety (90) days prior to the date the Trust Office notice is sent to the Contractor. A courtesy copy of the notice shall be sent to the Association that represents the

Contractor; provided, however, that the Trust Office's failure to send such notice to the Association shall not affect the Trust's rights against the Contractor.

**F.** Where a Contractor contracts with a listed delinquent subcontractor or subcontractors, and the Contractor fails to terminate the subcontract of such delinquent subcontractor, or subcontractors, the Contractor shall become financially responsible for the liability of the delinquent subcontractor's fringe benefits on that job from the commencement of the work under the subcontract to the date of termination of that subcontract.

**G.** The Trust Office shall send delinquency notices to Contractors whose contributions are not paid as required. The Trust Office shall notify the Union of those Contractors who fail to pay within five (5) days of such notice and the Union may, at its sole option withhold service from the Contractor involved until contributions are paid or satisfactory arrangements made with the Trustees for payment.

**H.** Any employee rendered unemployed by reason of the foregoing shall not be deemed engaged in a work stoppage or labor dispute but shall be deemed constructively laid off by the Contractor by failure to pay monies due for the benefit of the employees. Contractor agrees that such employees are entitled to unemployment insurance and warrants that he will take no action to interfere with the employee's application for unemployment insurance. Any dispute in connection with this paragraph is subject to the grievance procedure.

**I.** The Trust Office shall issue delinquency notices and clearances to Contractors confirmed in writing.

**J.** All employees shall be covered by this Agreement and the provisions applicable to Trust Funds. The Trustees shall have authority to audit Contractor records to determine the appropriate contributions and shall have specific authority to examine the Contractor's records, including but not limited to all payroll records (including certified payroll records, electronic payroll records, and all records reflecting payments to trust funds other than the Laborer Trust Funds of Southern California Federal W-2 Forms, Forms 1099 and 1096, Quarterly State Tax returns, and time cards), all cash disbursement ledgers, all canceled checks, check registers, invoices and bank checking account statements, the scope of work portion of all contracts and subcontracts between general contractors and subcontractors. If requested by the Trusts, the Contractor shall provide payroll breakdown by job, and shall provide the job location, legal description of the jobsite property if known, the owner of job location, the name and address of the entity for which the Contractor is working, the contact telephone number for the job, the names and social security numbers of the employees working on the job, the number of hours worked by each employee on the job, all preliminary notices, mechanic liens and stop notices on the job, other relevant job location information requested by the Trusts and certification of workers compensation coverage. The Trustees may file suit to enforce this obligation, and, if successful, shall recover their attorneys' fees and costs, whether or not the audit reveals a delinquency. Any Contractor delinquent under this Article may be required by the Trust Funds to submit, in addition to regular reports, payroll breakdowns by job, and the failure to submit timely

job breakdowns shall be considered a delinquency under this Article. If a Contractor refuses to furnish the foregoing the Union may take economic action.

**K.** The Contractor has a duty to report to the Trust Funds as required by the Agreement. The Contractor shall maintain for a period not less than four (4) years all payroll and related records showing all payments to persons or firms for work of the nature covered by this Agreement, including the records described in Section J, above. The Contractor shall make available such records for audit by the Trust Funds representative upon written request. The Contractor and the Union agree that such audits are expensive and time consuming for the Trust Funds and the Contractor, but the Trust Funds otherwise have no way of knowing the full extent of the Contractor's obligations, since the records showing the related employment are in the possession and control of the Contractor. In order to minimize the need for a frequency of such audits, the Contractor agrees that the Trustees and the Union place trust and confidence in the Contractor to report and pay contributions properly.

**L.** It is recognized that a delinquency in contributions causes damages beyond the value of the unpaid contributions, which are difficult to quantify. These damages include, but are not limited to, the administrative costs of processing and collecting delinquencies, the costs of adjusting benefit credits and notifying participants, the additional burden placed on Contractors who faithfully pay their contributions, and the burden upon participants and beneficiaries who may be unable to qualify for benefits they may have otherwise been entitled to but for the delinquency of the Contractor. Because these damages are difficult, if not impossible, to quantify on a case-by-case basis, the parties agree that liquidated damages, not a penalty, for such losses shall be set at the greater of $25 or 20% of the contributions late or unpaid for each Trust Fund. The parties have reviewed the costs of collection by the Trust Funds, and agree that 20% liquidated damages is an accurate projection of the Trusts' damages that result from a delinquency. In addition, any Contractor delinquent in its obligations under this Article shall be required to pay interest on the delinquent contributions (at a rate to be set by the Trustees of the Trust Funds), and any audit fees. In the event that litigation is necessary to collect any delinquent contributions (including litigation to enforce mechanic liens, stop notices, bond claims or similar remedies, and any bankruptcy or receivership proceedings) or to enforce any obligation under this Article, in addition to liquidated damages owed by the delinquent Contractor, the Contractor shall also be liable for all reasonable attorney fees and legal costs incurred in such litigation. The Trustees of the Trust Funds may waive or reduce the amount of liquidated damages, at their sole discretion and consistent with their fiduciary duties. The decision of the Trustees in any request to waive or reduce liquidated damages shall be final and binding upon the parties.

**M.** The Trust Funds' Joint Delinquency Committee may require a Contractor to post a satisfactory bond in a sum equal to two (2) times the amount of the delinquency or such lesser amount as the Committee may determine, to secure payments of contributions to the Trust Funds. Such amounts are to be determined by the Trust Funds, and shall increase if the Contractor's delinquency increases. The bond shall not be construed in any way as in lieu of any payments required under this Agreement. All such bonds shall be deposited with the Trust Administrator and shall be in a form acceptable to the Trusts. The bond shall remain in effect for a period of thirty-six (36) months after the delinquency giving rise to the obligation to post the

bond or until one year after the date that the Contractor is no longer bound to the Agreement or any successor Agreement, whichever is earlier.

**N.** For the purposes of this Agreement, delinquency in failure to make the required reports and contributions to the Trust Fund as determined by the Trustees, shall consist of the following:

(a) Failure to submit trust report forms completely filled out and executed..

(b) Failure to report on all employees.

(c) Failure to make the payments as required on time.

(d) Failure to pay audit amounts and audit fees and other costs and damages as determined by the Trust.

(e) Failure of the bank to honor checks submitted.

(f) Failure to pay monies due.

(g) Failure to submit to an audit.

(h) Failure to submit payroll breakdowns by job during an audit, if the Contractor maintains or can retrieve electronically such payroll breakdowns.

**O.** In addition to any other remedies under this Article, the Union may terminate the participation of a delinquent contractor. Notice of such termination shall be sent to the Contractor, and each of the employees listed on the last report submitted by that Contractor, and shall be effective 30 days from such notice. Upon termination, no employee of the delinquent Contractor shall accrue credit for any benefits for hours worked for that Contractor. However, termination shall not end or alter the obligations of the Contractor (or any Contractor subcontracting to that Contractor) under this Article. In addition to any other damages under this Article, a Contractor so terminated shall be liable to the Trust Fund for the cost of notice, and shall be liable to its employees for the value of any benefits lost in an amount not exceeding the hourly contributions and liquidated damages that would otherwise have been due.

## Article XXVI

### Public Works Project Davis-Bacon Act and Related Statutes

In the event an individual Employer bids a public job or project being awarded by a federal, state, county, city or public entity which is to be performed at a predetermined and/or prevailing wage rate established by the Secretary of the U.S. Department of Labor (pursuant to Public Law 74-403 as amended by Public Law 88-349 whose regulations are contained in 29 CFR Parts 1, 3, 5 and 7, and which determinations are published in The Federal Register), or by the Director of the California Division of Industrial Relations, or a County, City or other public entity and the established prevailing wage rate, including vacation contributions, is lower by no more than fifteen (15%) percent on residential or housing work or by no more than ten (10%) percent on any other type of work, than the Master Labor Agreement hourly wage rate (excluding fringe benefits) the published hourly wage rate, including vacation contributions, at the time of bid shall apply to the job or project for the duration of the job or project but in no event to exceed an eighteen (18) month period.

Case 2:13-cv-00414-DMG-JEM Document 113 Filed 02/14/14 Page 1 of 19 Page ID #:1706

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CONSTRUCTION LABORERS TRUST FUNDS FOR SOUTHERN CALIFORNIA ADMINISTRATIVE COMPANY,

Plaintiff,

v.

GROUND SERVICE TECHNOLOGY, INC., et al.,

Defendants.

Case No. CV 13-414 DMG (JEMx)

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [82]**

This matter is before the Court on Plaintiff Construction Laborers Trust Funds for Southern California Administrative Company's ("Plaintiff" or "Trust Funds") motion for partial summary judgment. [Doc. # 82.] The Court held a hearing on the motion on February 14, 2014. Having duly considered the parties' written submissions and oral argument, the Court now renders its decision.

**I.**

**FACTUAL BACKGROUND**

As it must on this motion for summary judgment, the Court sets forth the material facts and views all reasonable inferences to be drawn from them in the light most

favorable to Defendant Ground Service Technology, Inc. ("GST"), the non-moving party. The following facts are undisputed unless otherwise noted.

Plaintiff is an administrator and agent for the collection of various employee benefit plans and a fiduciary to those plans. (GST's Statement of Genuine Disputes of Material Fact ("SGD") ¶ 1 [Doc. # 102].) The plans are express trusts created by written agreements and are employee benefit plans within the meaning of the Employee Retirement Income Security Act ("ERISA") § 3(3), 29 U.S.C. § 1002(37)(A). (*Id.*) The plans are maintained as jointly-managed trusts, pursuant to the Labor-Management Relations Act ("LMRA") § 302(c)(5), 29 U.S.C. § 186(c)(5), and ERISA. (*Id.*)

GST is a corporation that provides "full-service erosion control" for projects. (*Id.* ¶ 2; Erler Decl. ¶ 3.) On or about July 9, 2012, GST signed a document entitled Laborers' Public Works Project Agreement ("the Caltrans agreement"), a collective bargaining agreement with the Southern California District Council of Laborers and its affiliated Local Union, Local 1184. (SGD ¶ 10; *see* Stipulation of Facts ("Stip."), Ex. 1 [Doc. # 84].) The agreement specifies terms and conditions of employment for GST's work on a project for the California Department of Transportation ("Caltrans"). (Stip. ¶ 10; *id.*, Ex. 1.) The Caltrans agreement incorporates the terms of the Master Labor Agreement between Southern California General Contractors and The Southern California District Council of Laborers.[1] (SGD ¶ 15.) GST performed work under the

---

[1] GST disputes Plaintiff's summary of the Caltrans agreement, noting that the agreement incorporates only the "current" multi-employer Construction Labor Agreements for Southern California. (SGD ¶ 15.) The Master Labor Agreement provides as follows with respect to its term, termination, and renewal:

> The term of this Agreement is July 1, 2009, to June 30, 2012, **and from year to year thereafter** unless either the Union or the Associations give written notice received by the others not less than sixty (60) days prior to June 30, 2012, or sixty (60) days prior to June 30 of any subsequent year, of a desire to change, amend, modify, or terminate the Agreement.

(Master Labor Agreement, Art. XII [Doc. # 101-1] (emphasis added).) As GST has identified no evidence that the Master Labor Agreement was changed, amended, modified, or terminated, it is

agreement ("the Caltrans project") from approximately April 6, 2012 through March 2013, and again from September 2013 through November 2013. (Erler Decl. ¶ 9.)

On or about November 10, 2010, GST signed a letter in which it agreed to be party to and bound by the San Diego County Water Authority Emergency Storage Project Labor Agreement ("the Water Authority agreement") with respect to all work covered by that agreement. (SGD ¶ 11; *see* Stip., Ex. 2.) GST performed under the agreement ("the San Vicente Dam project") from approximately December 3, 2010 through March 31, 2013. (Erler Decl. ¶ 7.)

GST performed work on the Clairemont High School Stadium Improvements Project ("the Clairemont project"), which constituted "covered work" under the San Diego Unified School District Project Stabilization Agreement ("the SDUSD agreement"). (SGD ¶¶ 12-13; *see* Stip., Ex. 3.) GST performed work on the Clairemont project from approximately December 31, 2010 through August 31, 2012. (Erler Decl. ¶ 8.)

The Caltrans agreement, Water Authority agreement, and SDUSD agreement incorporate certain terms of a multi-employer collective bargaining agreement between the Southern California District Council of Laborers and various employer associations, known as the Master Landscape Agreement and Master Engineering Agreement.[2] (*Id.* ¶

---

undisputed that the Master Labor Agreement was incorporated by the Caltrans Agreement and applied for the duration of GST's work on the Caltrans Project.

To the extent that GST objects under the best evidence rule to Plaintiff's characterization of the contractual terms as reflected in the Quevedo Declaration about the contents of the Letter of Assent, Caltrans agreement, Water Authority agreement, SDUSD agreement, and Trust Agreements [Doc. # 103 at 14-16], GST's objections are **SUSTAINED**. The Court notes, however, that GST does not object to the admission of the original documents, and indeed has stipulated to the authenticity of several of them. [Doc. # 84.] The Court addresses GST's additional objections to the extent that the underlying facts are relevant to this Order.

[2] GST disputes Plaintiff's "summary" of the terms of the agreements, specifically Plaintiff's contention that the agreements "refer to and incorporate" certain terms of the collective bargaining agreement. (SGD ¶ 16.) As GST appears to dispute only Plaintiff's statement that the agreements "specifically refer" to the collective bargaining agreements, and does not establish a genuine dispute of material fact with respect to whether the agreements incorporate the collective bargaining agreement, the

16.) The Master Labor Agreement, Master Landscape Agreement, and Master Engineering Agreement ("the Master Agreements") require contributions to the Trust Funds for covered work. (*Id.* ¶¶ 17-20.) The Master Agreements provide authority to Plaintiff to conduct an audit of GST's records. (*Id.* ¶¶ 21-23.) Specifically, the Master Labor Agreement provides:

> The Trustees shall have authority to audit Contractor records to determine the appropriate contributions and shall have specific authority to examine the Contractor's records, including but not limited to all payroll records (including certified payroll records, electronic payroll records, and all records reflecting payments to trust funds other than the Laborer Trust Funds of Southern California Federal W-2 Forms, Forms 1099 and 1096, Quarterly State Tax returns, and time cards), all cash disbursement ledgers, all canceled checks, check registers, invoices and bank checking account statements. If requested by the Trusts, the Contractor shall provide payroll breakdown by job, and shall provide the job location, legal description of the jobsite property if known, the owner of job location, the name and address of the entity for which the Contractor is working, the contact telephone number for the job, the names and social security numbers of the employees working on the job, the number of hours worked by each employee on the job, all preliminary notices, mechanic liens and stop notices on the job, other relevant job location information requested by the Trusts and certification of workers compensation coverage. The Trustees may file suit to enforce this obligation, and, if successful, shall recover their attorneys' fees and costs, whether or not the audit reveals a delinquency. Any Contractor delinquent under this Article may be required by the Trust Funds to submit, in addition

---

latter fact is undisputed. "Rule 56(e) . . . requires the nonmoving party to . . . designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotation marks omitted).

> to regular reports, payroll breakdowns by job, and the failure to submit timely job breakdowns shall be considered delinquency under this Article. If a Contractor refuses to furnish the foregoing the Union may take economic action.

(Master Labor Agreement, Art. XXIII(J) [Doc. # 101-1].) The other Agreements contain the same or similar language. (SGD ¶¶ 22-23.)

The Master Agreements also incorporate the terms of the Trust Agreements.[3] (*Id.* ¶¶ 17-20.) The Trust Agreements provide Trustees and their agents with authority to audit GST's records.[4] (*Id.* ¶¶ 24-25.) The following language in the Agreement and Declaration of Trust Establishing the Construction Laborers Pension Trust for Southern California is representative of language in most of the Trust Agreement excerpts submitted by Plaintiff:

> The Board of Trustees shall maintain suitable and adequate records of and for the administration of the Fund and the Pension Plan. The Board may require the Association, any Individual Employer, the Union, any Local Union, an Employee or Retired Employee, or any other beneficiary under the Pension Plan to submit to it any information, data, report or documents reasonably relevant to and suitable for the purposes of such administration . . . . The Trustees may, at reasonable times and during normal business hours, audit or cause the audit or an inspection of the records of any Individual Employer which may be pertinent in connection with said

---

[3] GST contends that the Master Agreements "contain similar trust fund provisions," but disputes that any of the Master Agreements "expressly refer to and incorporate by reference the terms of the Trust Agreements." (SGD ¶ 17.) GST does not identify, however, any material facts that raise a genuine dispute. *Celotex*, 477 U.S. at 324.

[4] While GST disputes Plaintiff's interpretation of the Trust Agreements, it does not dispute the fact that the Trust Agreements authorize Trustees to audit its records. (SGD ¶ 24.)

Contributions and/or reports and insofar as same may be necessary to accomplish the purposes of this Trust Agreement.

[Doc. # 87, Ex. 14 ¶ 5.24; *see also id.*, Ex. 13 §§ 4, 7; *id.*, Ex. 15 ¶¶ 5.23, 9.03; *id.*, Ex. 16 ¶¶ 5.23, 9.03; *id.*, Ex. 18 ¶ 5.11; *id.*, Ex. 19 § 7.4.[5]]

Plaintiff requested an audit of GST's records after Laborers Union Local 89 found that GST was working on the San Diego County Water Authority Emergency Storage Project, but the Trust Funds records did not reflect that GST had submitted any contribution reports for that project. (SGD ¶ 26.) GST provided some payroll records on January 18, 2012 to the Trust Funds' auditor, but the records did not include a detail of the projects worked on by employees. (*Id.* ¶ 27.) The auditor requested a follow-up appointment and for a few months tried unsuccessfully to get additional records from GST. (*Id.* ¶¶ 27-28.) On September 17, 2012, an attorney for GST sent the auditor an email denying the auditor's request for records, contending that GST "owe[d] no duty" to provide the requested records, asking the auditor not to contact GST directly in the future, and threatening legal action against the auditor, the Trust Funds, and the unions if the auditor "cho[]se to ignore" the email. (*Id.* ¶ 29.) The auditor was unable to obtain additional records through GST's attorney. (*Id.* ¶ 30.)

On January 18, 2013, Plaintiff filed the instant action. (*Id.* ¶ 30; *see* Compl. [Doc. # 1].) The Joint Rule 26(f) Discovery Plan submitted by the parties provided that initial discovery disclosures would be stayed until Plaintiff "completed" an audit of GST's records. (SGD ¶ 31; Discovery Plan [Doc. # 16 at 4].) By the end of May 2013, GST had provided only some records relating to the Caltrans Project. (SGD ¶ 32.) Plaintiff

---

[5] Two of the Trust Agreements submitted by Plaintiff are illegible. [*See* Doc. # 87, Ex. 17; *id.*, Ex. 20.] The Trust Agreement Governing the San Diego County Construction Laborers' Pension Trust Fund also provides for auditing of an employer's records, but it outlines a specific procedure that the Trust Fund is to follow where it has received evidence of the employer's irregular reporting. [*Id.*, Ex. 21 § 5.]

began formal discovery in June 2013. (*Id.* ¶ 33.) GST failed to respond to Plaintiff's initial request for production of documents by the due date.[6] (*Id.* ¶ 34.)

On October 3, 2013, the Honorable John E. McDermott, United States Magistrate Judge, granted Plaintiff's motion to compel discovery and motion for sanctions against GST for failure to timely produce discovery. (Order of October 3, 2013 [Doc. # 36].) Judge McDermott held that GST's non-disclosure of documents was not substantially justified and GST had been "cavalier about Court procedures." (*Id.* at 2.) He ordered GST "to step up its efforts immediately." (*Id.* (emphasis in original).) On November 25, 2013, Judge McDermott granted Plaintiff's motion to compel additional discovery and indicated that he had "no choice but to award sanctions" against GST. (Order of November 25, 2013 [Doc. # 53].) The Court held that GST's discovery conduct was "to put it bluntly, unacceptable" and GST had provided no reasons to excuse its conduct. (*Id.* at 1, 3.) On December 3, 2013, Judge McDermott held that "more severe sanctions" were required because GST had failed to pay Court-ordered sanctions and had failed to comply with Court orders regarding discovery. (Order of December 3, 2013 [Doc. # 60].) The Court ordered a GST representative—not counsel—to serve a verification under oath and subject to penalty of perjury that GST had produced documents in discovery pursuant to a prior Court order. (*Id.* at 2-4.) On December 18, 2013, Judge McDermott indicated that the Court had received a declaration from a GST representative stating that GST had produced various documents, but Plaintiff contended it had not received them. (Order of December 3, 2013 [Doc. # 60].) Judge McDermott stated that it was "unclear whether the documents were mailed by GST and just not been received

[6] GST objects to the statements regarding discovery in the Hamasaki Declaration on the grounds that they are irrelevant under Federal Rule of Evidence 401 and substantially more prejudicial than probative under Rule 403. [Doc. # 103 at 2-14.] The Court **OVERRULES** GST's blanket objections. GST's conduct during discovery in this case is relevant to the appropriate scope of the audit, as discussed more fully *infra*, and GST has identified no prejudice that it suffers as a result of the Court considering its conduct, let alone sufficient prejudice to *substantially* outweigh the probative value of the evidence.

by Plaintiff yet or there continues to be non-compliance as well as a false declaration . . . ." (*Id.* at 1.)

Based on the records GST has already produced and records Plaintiff obtained from public agencies,[7] Plaintiff's auditor has found (1) more GST employees were working on the Water Authority Project than GST reported on certified payroll records it produced; (2) GST's employees worked more hours than GST reported to the Trust Funds; (3) there appear to be differences between certified payroll records GST produced and the same payroll records produced by public agencies; and (4) there are differences between what GST contends are the same certified payroll records produced at different times by GST.[8] (SGD ¶¶ 38-42.)

Plaintiff seeks an order compelling GST to "submit to an audit of [its] payroll and business records" and to produce, and provide Plaintiff or its designated agent direct access to, the following records from the time period of September 2011 to the present ("the AUDIT PERIOD"):

1.1 All payroll and employee documents during the AUDIT PERIOD including, but not limited to, EMPLOYER'S payroll journals, employees earning records, certified payrolls, payroll check books and stubs, canceled payroll checks, payroll time cards, state and federal payroll tax returns, labor distribution journals, any other documents reflecting the number of hours which EMPLOYER'S employees worked, their names, social security numbers, addresses, job classifications and identification of the projects on which the employees performed their work.

---

[7] Plaintiff obtained records pursuant to the California Public Records Act ("CPRA"), Cal. Gov't Code § 6250 *et seq.*, and under Cal. Lab. Code § 1776 *et seq.* (SGD ¶ 37.)

[8] GST does not dispute these facts, except "to [the] extent that such a finding authorizes an audit by Plaintiff of all of GST's business records from October 2010 without any limitation." (SGD ¶¶ 38-42.) GST has not identified any material facts that raise a genuine dispute. *Celotex*, 477 U.S. at 324.

1.2 All EMPLOYER'S documents during the AUDIT PERIOD related to cash receipts, including but not limited to, the cash receipts journal, accounts receivable journal, accounts receivable subsidiary ledgers and billing invoices.

1.3 All EMPLOYER'S bank statements during the AUDIT PERIOD for all checking, and savings accounts.

1.4 All EMPLOYER'S documents during the AUDIT PERIOD related to cash disbursements, including but not limited to, vendors' invoices, cash disbursement journal, accounts payable journals, check registers, and all other documents which indicate cash disbursements.

1.5 All collective bargaining agreements between EMPLOYER and any trade union in effect at any time during the AUDIT PERIOD.

1.6 All reports and statements submitted to any employee benefit plan, and a copy of the check(s) to such plan(s), for which EMPLOYER has claimed a credit on any certified payroll reports for work performed during the AUDIT PERIOD.

1.7 The Files for the following PROJECTS, including all documents, agreements, and contracts between EMPLOYER and any general contractor, subcontractor, builder and/or developer, field records, job records, notices, project logs, supervisor's diaries or notes, employees diaries, memorandum, releases and any other documents which related to the supervision of EMPLOYER'S employees on the PROJECTS on which they performed work:

California Department of Transportation project identified as Contract No. 08-448404 ("CALTRANS PROJECT");

San Vicente Dam Raise Package 3-Roller Compacted Concrete Dam and Appurtenant Facilities" [sic] ("DAM PROJECT");

> The project for the San Diego Unified School District (SDUSD) known as the "Cla[i]remont High School Stadium Improvements" (CLA[I]REMONT PROJECT);
>
> Any other project for SDUSD subject to ["]San Diego Unified School District Project Stabilization Agreement Construction and Major Rehabilitation funded by Proposition S" ("SDUSD AGREEMENT")[.]

(Proposed Order ¶¶ 1-2 [Doc. # 82-1].) Plaintiff also seeks a hearing on an Order to Show Cause ("OSC") regarding GST's compliance with the audit order, at which GST's President, Secretary/Treasurer/ and Executive Vice President are ordered to personally appear, in addition to any other representative of GST responsible for complying with the Court's Order. (*Id.* ¶ 3.)

## II.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (quoting Fed. R. Civ. P. 56(c), (e) (1986)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial.").

"[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

**III.**

**DISCUSSION**

**A. <u>Legal Standard</u>**

Plaintiff contends that it is entitled to summary judgment on its second claim for relief, specific performance compelling an audit. (First Amended Complaint ("FAC") ¶¶ 32-38.) ERISA authorizes a fiduciary of a plan to bring a civil action "to obtain other appropriate equitable relief" and "to enforce any provisions of this subchapter or the terms of the plan," 29 U.S.C. § 1132(a)(3), and it authorizes a court to grant "such other legal or equitable relief as the court deems appropriate." *Id.* § 1132(g)(2). To determine the scope of a pension benefit plan's right to audit, the Supreme Court looks to the documents governing the contractual relationship between the employer and the plan, and specifically the collective bargaining agreement and the trust agreements it incorporates. *See Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 565 105 S. Ct. 2833, 86 L. Ed. 2d 447 (1985). "[T]he trust documents, if consistent with the ERISA statute, govern the scope of the trustees' rights and duties." *Santa Monica Culinary Welfare Fund v. Miramar Hotel Corp.*, 920 F.2d 1491, 1494 (9th Cir. 1990), citing *Cent. States*, 472 U.S. 559. The Supreme Court has noted in *dicta* that "auditing powers of a benefit plan are limited to prudent actions furthering the legitimate purposes of the plan," and "a court ordering an employer to comply with a particular audit demand could, upon a proper showing by the employer, limit the auditors accordingly." *Cent. States*, 472 U.S. at 582 & n.23.

**B. <u>Trust Documents Provide Broad Auditing Authority</u>**

Here, as discussed *supra*, both the collective bargaining agreements ("CBAs") and the Trust Agreements ("TAs") provide Plaintiff with broad auditing authority. For example, the Master Labor Agreement provides Plaintiff with authority to "audit

Contractor records to determine the appropriate contributions" and "specific authority to examine the Contractors' records, *including but not limited to* all payroll records . . . , all cash disbursement ledgers, all canceled checks, check registrars, invoices and bank checking account statements." (Master Labor Agreement, Art. XXIII(J) (emphasis added) [Doc. # 101-1].) A representative Trust Agreement provides Plaintiff with authority to "at reasonable times and during normal business hours, audit or cause the audit or an inspection of the records of any Individual Employer which *may be pertinent* in connection with said Contributions and/or reports and insofar as same *may be necessary* to accomplish the purposes of this Trust Agreement." [Doc. # 87, Ex. 14 ¶ 5.24 (emphasis added).]

As discussed, *supra*, Plaintiff specifies in its Proposed Order that it seeks to audit the following documents from the audit period: (1) all payroll and employee documents; (2) all documents related to cash receipts; (3) all bank statements; (4) all documents related to cash disbursements; (5) all collective bargaining agreements between GST and any trade union; (6) all reports and statements submitted to any employee benefit plan and a copy of the check to such plan for which GST has claimed a credit on any certified payroll records; and (7) the files for the covered projects on which GST worked. As an initial matter, the CBAs specifically enumerate many of the records Plaintiff has identified as subject to audit. (*See, e.g.*, Master Labor Agreement Art. XXIII(J) [Doc. # 101-1].) The CBAs also provide Plaintiff with general authority to "audit Contractor records to determine the appropriate contributions" and to examine Contractor records other than those specifically enumerated. (*Id.*) The TAs also provide Plaintiff with authority to audit records which *may be necessary* to accomplish the purposes of the Trusts. [*See, e.g.*, Doc. # 87, Ex. 14 ¶ 5.24.]

**C. <u>Plaintiff's Proposed Audit is Authorized by the Trust Documents and GST Has Not Shown that the Audit Must Be Limited</u>**

GST apparently concedes that Plaintiff has a right to audit its records (*see* Opp'n at 10), and it does not contend that the proposed audit is inconsistent with ERISA. Rather,

GST argues that the scope of the proposed audit is not authorized by the trust documents, and it contends that (1) the auditor should not be given direct access to GST's documents, and (2) the Court should not enforce compliance with the audit by making GST's directors personally appear in Court. (Opp'n at 7-15.)

**1. <u>Scope of the Proposed Audit</u>**

Plaintiff contends that the trust agreements authorize an audit of documents beyond those that GST concedes are relevant. (Mot. at 10-11.) Specifically, Plaintiff explains that its audit must include all payroll records because GST is a contractor that sends its employees to different projects, and Plaintiff needs to audit GST's entire construction work force to determine which workers worked which hours on covered projects. (Reply at 6.) Plaintiff notes that in *Central States*, the Supreme Court cited with approval the "elementary auditing principle that for an auditor to verify a certain selection decision, he must refer to a universe broader than the selection itself." (Mot. at 10-11 (quoting *Cent. States*, 472 U.S. at 567).) Plaintiff also explains that it needs to audit all documents related to cash disbursements because these documents may show that GST subcontracted covered work to a non-signatory sub-contractor, in violation of the parties' contractual agreements. (Reply at 6-7.)

In *Central States*, the Supreme Court held that a trust fund's proposed random audit of an employer's payroll, tax, and other personnel records of employees who the employer claimed were not plan participants—more than half of the employer's workforce—was appropriate pursuant to the parties' trust documents. *Cent. States*, 472 U.S. at 563. The Court focused on the benefit plan's interpretation of the specific and general grants of power in the trust documents, and the plan's contention that generally accepted accounting principles confirmed the reasonableness and propriety of the proposed audit. *Id.* at 565-67. The Court also noted that the trust documents explicitly provided that any construction adopted by the Trustees in good faith would be binding, and there was no evidence of bad faith in the record. *Id.* at 568. In this case, while Plaintiff has not identified any provision of the trust documents specifying that any good

faith construction adopted by the Trustees is binding, Plaintiff has identified specific and general powers granted to it in the trust documents, and its interpretation of those documents with respect to its proposed audit is reasonable.

GST's arguments that Plaintiff's proposed audit is overbroad are unavailing. First, GST erroneously contends that Plaintiff "has not specifically identified the types of documents that it seeks to audit" and rather it seeks to audit *all* of GST's records from October 2010 to present. (Opp'n at 7.) As discussed, *supra*, Plaintiff has provided a detailed list of the documents it seeks to audit in its proposed order. Second, GST argues that because Plaintiff has authority under the CBAs to audit only those records necessary to "determine the appropriate contributions," it lacks authority to audit any projects that are not covered by the CBAs. (*Id.* at 10.) GST's conclusion is incorrect as a matter of law. As Plaintiff noted, the Supreme Court in *Central States* cited with approval the generally accepted auditing standards, including that an "auditor should determine that the population from which he draws the sample is appropriate for the specific audit objective. *For example, an auditor would not be able to detect understatements of an account due to omitted items by sampling the recorded items. An appropriate sampling plan for detecting such understatements would involve selecting from a source in which the omitted items are included*." 472 U.S. at 565 (emphasis in original). Here, Plaintiff suspects, for good reasons, that GST has understated the number of employees and number of hours employees worked in covered projects. Accordingly, it must draw from a sample size in which the omitted items are included, in order to determine the appropriate contributions to the benefit funds.

GST's reliance on *Trustees of Michigan Regional Council of Carpenters Employee Benefit Fund v. Exhibit Works, Inc.*, 868 F. Supp. 2d 592, 602 (E.D. Mich. 2012), is

Case 2:13-cv-00414-DMG-JEM Document 113 Filed 02/14/14 Page 15 of 19 Page ID #:1720

misplaced. First, this Court is not bound by the opinion of a Michigan district court.[9] Moreover, the analysis in *Exhibit Works* demonstrates why the case is distinguishable. The *Exhibit Works* court discussed the Supreme Court's holding in *Central States* that an audit had an appropriate scope where

> the entire universe of employees whose records the trustees sought to review had the potential, depending on their job description and status, to be covered under the plans. Accordingly, allowing the auditors to examine the "payroll, tax and personnel" records of all employees, including those who Central States had determined were "not covered," had the potential to unearth unidentified plan participants who would have valid claims against the funds for benefits but for Central States mistaken classification of "covered" employees.

868 F. Supp. 2d at 603. In contrast, in *Exhibit Works*, the jurisdiction of the CBA was limited to certain counties in Michigan, and the plaintiffs sought to audit payroll and wage records of employees who were employed outside of Michigan. The court denied this request because the employees at issue were "by definition . . . not covered by the CBA," and the plaintiffs had not demonstrated that the employer had the potential to owe *any* contributions for work performed by those individuals. *Id.* at 594-600, 603-05. In this case, however, all GST's employees apparently work in the same geographic area, and Plaintiff has explained that a review of GST's payroll and other records might unearth unidentified employees and hours covered by the plans.

Third, GST's argument that it has no additional obligations under the CBAs to provide project files because it has already provided Plaintiff with information identifying job locations and owners (Opp'n at 11-12), finds no support in the trust

[9] The Court rejects GST's argument that *Exhibit Works* mandates that a three-part test be met in order for an audit to be appropriate (Opp'n at 6-7), as this analysis finds no support in Ninth Circuit case law.

documents. Moreover, Plaintiff has explained that it seeks to conduct an audit because it believes that GST has not provided all relevant records, and Judge McDermott's discovery orders support Plaintiff's contentions. Indeed, GST concedes that it is *still* compiling pay stubs for the San Vicente project for December 2010 through March 2013. (*Id*. at 12; Linnaus Decl. ¶ 5.)

Fourth, GST's contention that Plaintiff's proposed time period for the audit is overbroad because the audit would include records from one month before the first CBA and two months before GST began to perform covered work (*id.* at 12), is equally unpersuasive. No great analytical leap is required to surmise that Plaintiff seeks to compare the time period immediately before covered work began to the period after work began to determine whether the records reveal any new expenses attributable to covered work.

Accordingly, Plaintiff has construed the trust documents in a reasonable manner to authorize its proposed audit of the documents it has enumerated which are in GST's possession, custody, and control. Plaintiff's request to audit the documents it has enumerated is **GRANTED**.

**2. <u>Plaintiff Has Shown that Direct Access to GST's Records is Appropriate</u>**

Plaintiff contends that the auditor must have direct access to GST's records, rather than relying on documents assembled by GST because (1) records produced by GST have contradicted records from public agencies as well as records produced by GST itself, (2) GST has failed to comply with an audit to which it agreed, (3) GST has failed to comply with Judge McDermott's discovery orders, and (4) GST's officials have lied under penalty of perjury regarding their compliance with discovery orders. (Mot. at 11-12; Reply at 7.) Notably, GST does not dispute Plaintiff's contentions with one exception—it contends that it provided additional documents in compliance with Judge McDermott's order. (*See* SGD ¶¶ 31-32, 35-36, 39-42.) Nor does GST argue that direct access to records is not authorized by the trust documents.

Rather, GST argues that it has "legitimate privacy and confidentiality concerns" relating to Plaintiff directly accessing its records. (Opp'n at 13.) First, GST notes that its technology division "provides a vast array of technology services to clients world-wide." (*Id.*) Without any explanation or factual support, GST states that "[s]omeone unfamiliar with GST's systems could easily mistakenly disrupt these technology services to companies around the world." (*Id.*; *see also* Erler Decl. ¶ 13.) The Court rejects this unsupported exaggerated claim. Moreover, Plaintiff clarifies that it "ha[s] no interest in any of the records involving the Employer's wholly-separate technology business" and it seeks "'direct access, not unattended access" to GST's records. (Reply at 10.) Finally, Plaintiff's counsel "has computer professionals familiar with these systems who can assist the auditor and the Employer's personnel in accessing the proper records only, and nothing else." (*Id.*)

Second, GST notes that it maintains confidential and private information of "its clients" on its servers, and it is prohibited from disclosing such information pursuant to "various confidentiality agreements." (Opp'n at 13; *see also* Erler Decl. ¶ 14.) GST does not identify evidence that any of the records Plaintiff seeks to audit are protected by confidentiality agreements. Indeed, it is not clear whether the confidential and private information GST seeks to protect relates to its construction business or its technology division. Moreover, it is not apparent why any confidential and private information would be accessible to an auditor reviewing payroll and other records related to GST's construction business.

GST also asks the Court to order "other prophylactic measures" including (1) mandating that all documents reviewed be kept confidential, (2) preventing the auditor from removing or copying "private and sensitive financial and business records," and (3) restricting the use of information to the appropriate purposes of the audit. (Opp'n at 14.) GST has thus far provided no evidence that any of the records Plaintiff seeks to audit are confidential and/or that there are legitimate reasons why the auditor cannot copy them. If, in the future, GST identifies legitimate reasons justifying limits on Plaintiff's audit, the

Court will consider them in the event the parties cannot reach a mutual agreement as to items which should be subject to a protective order approved by the Magistrate Judge. Moreover, as Plaintiff notes, the parties, counsel, and fiduciaries of the Trust Funds are already limited by existing rules and laws with respect to use of the information provided by the audit. (Reply at 9.)

Accordingly, GST has not borne its burden to demonstrate that the auditor should not be given direct access to GST's records and computer systems. *Cent. States*, 472 U.S. at 582 n.23. Plaintiff's request for direct access to GST's records and computer systems is **GRANTED**.

**3. <u>Plaintiff's Request that GST's Managing Officer be Required to Appear In Person at a Hearing</u>**

Plaintiff asks that the Court require GST's managing officers to personally appear at a hearing "to testify as to compliance" with the Court's audit order. (Reply at 9.) Plaintiff contends that the history of this litigation, described at length *supra*, demonstrates that such an extreme step is necessary. The Court agrees.

To date, Judge McDermott has repeatedly granted Plaintiff's motions to compel and motions for sanctions due to GST's failure to comply with discovery requests and court orders. Moreover, Judge McDermott has repeatedly demanded that GST's managing officers—not counsel—submit declarations under oath regarding GST's compliance with discovery requests. GST's conduct demonstrates that ordinary measures may not prove effective in ensuring GST's compliance with the Court's Order. GST does not directly respond to Plaintiff's argument, but argues erroneously that Plaintiff seeks to impose personal liability on its officers. (Opp'n at 14-15.)

At the hearing on this matter, Plaintiff indicated that it would agree to limit its request for personal appearance and testimony to GST President Jennifer Erler. Nonetheless, Plaintiff requests that the Court's Order be personally served on Jennifer Erler, GST's Secretary/Treasurer Hank Erler, and GST's employee, Rachelle McCray.

Accordingly, the Court orders GST's President, Jennifer Erler, to personally appear before Magistrate Judge McDermott, who shall provide a report and recommendation regarding GST's compliance with this Order and whether sanctions should be imposed for non-compliance. Plaintiff shall schedule a date for a hearing on the OSC before Magistrate Judge McDermott that is no later than 45 days from the date of this Order. Within five court days from the date of this Order, all counsel shall file a proof of service of this Order on their respective clients, including personal service on Jennifer Erler, Hank Erler, and Rachelle McCray.

**IT IS SO ORDERED**.

DATED: February 14, 2014



DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

McLEOD & WITHAM LLP

300 SOUTH GRAND AVENUE
SUITE 2525
LOS ANGELES, CALIFORNIA 90071
TEL 213-627-3600 FAX 213-627-6290
www.mmwf.com

Author Phone: (213) 627-6286
dmcleod@mmwf.com

August 11, 2016

**BY EMAIL**

J. David Sackman
REICH, ADELL &CVITAN
3550 Wilshire Boulevard, Suite 2000
Los Angeles, California 90010

Re: Morrow-Meadows Corporation;
Audit Billing Account #104344

Dear Mr. Sackman:

Morrow-Meadows is disappointed that you have refused its reasonable audit offer. As you are aware, the simple fact is that one employee who was a core driller was reported to the Laborers Trust Funds and the other field employees to the Electricians. The full audit demand is patently unreasonable under the facts.

The bottom line is that this is a jurisdictional dispute between the Electricians Union and the Laborers Union and should be resolved as such. The Laborers Trust Funds is asserting a claim that should be asserted by the Laborers Union. However, since the Laborers Union knows that it would lose such a grievance it has chosen to improperly try an end run through the Trust Funds. Morrow-Meadows urges your client to reconsider and accept the audit offer set forth in my July 11 letter.

Very truly yours,

David S. McLeod